UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WINSTON & STRAWN, LLP,

    Plaintiff,

vs.

HAROLD E. DOLEY
and DOLEY SECURITIES, INC.,

    Defendants.

Case No: 1:08-cv-00144 (RBW)

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS,
OR IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT**

    Plaintiff Winston & Strawn LLP ("Plaintiff" or "W&S"), by and through its undersigned counsel, hereby opposes the Motion to Dismiss the Complaint, or in the Alternative, for a More Definite Statement ("Motion to Dismiss"), filed by Defendants Harold E. Doley and Doley Securities, Inc. (together, "Defendants").

## INTRODUCTION

    Plaintiff's Complaint alleges that the parties entered into an attorney-client relationship and Defendants owe W&S more than $85,000 for invoiced fees and expenses. In their Motion to Dismiss, Defendants argue that this claimed debt is unenforceable as a matter of law because the engagement letter and corresponding invoices purportedly are "so indefinite that no contract was formed." Defs' Br. at 2. In essence, Defendants' theory of defense is that engagement letters used by nearly every law firm in the country and authorized by the D.C. Rules of Professional Responsibility do not create binding contracts with their clients. This argument should be rejected out of hand.

The engagement letter here – like most attorney-client engagement letters – stated the nature of the engagement, explained that fees would be billed within a range of hourly billing rates, and described the costs to be included in the charges. Doley, a sophisticated businessman, and his company had the opportunity to consult with independent counsel and, on their own volition and understanding of what the agreement entailed, signed the engagement letter agreement. After the contract was signed, W&S conducted, and billed for, legal services on Defendants' behalf. But Defendants have failed to pay for these services. This is a classic example of a breach of contract. Consequently, Defendants' Motion to Dismiss should be denied.

Defendants' request for a more definite statement is similarly without merit. Defendants are on fair notice of the basic claim against them and should be able to frame a responsive pleading.

## BACKGROUND

As the Complaint describes, in the early spring of 2007, Defendants selected W&S to represent each of them in connection with an investigation by the Office of the Thrift Supervision ("OTS"). Compl. ¶ 6. Before W&S's representation of Defendants began, two partners of W&S explained to Defendants the fees and costs that would be associated with W&S's representation of the Defendants – fees and costs to which Defendants agreed. *Id.* ¶ 7. Based on that oral agreement, and before any work was done on Defendants behalf, W&S sent to Defendants an engagement letter agreement. *Id.* ¶ 8.

The parties' agreement discussed the terms of the attorney-client relationship and explicitly stated, among other things, that: (1) the nature of the engagement would concern W&S's representation of Defendants in the OTS investigation; (2) W&S's fees would be

determined on an hourly basis within an hourly rate range; (3) the firm's monthly bills would include allocable charges for costs and expenses incurred in performing the legal services; (4) the firm expected Defendants to pay these bills within 30 days of the invoice; and (4) Defendants were to pay a $10,000 retainer to initiate the engagement. *Id.* ¶¶ 8-10. Defendants were given the opportunity to consult with independent counsel regarding the engagement letter, a right they acknowledged, and Defendants signed the engagement letter on April 20, 2007. *Id.* ¶¶ 11-12. W&S received the $10,000 retainer from Defendants on May 23, 2007. *Id.* ¶ 10.

After the parties signed the engagement letter, W&S performed legal work on behalf of Defendants based on the terms of the parties' agreement. *Id.* ¶ 13. The legal work included reviewing thousands of documents that were produced to the OTS; providing advice regarding certain purchases of stock; and preparing Doley for, and defending, his deposition. *Id.* W&S devoted a total of 215.25 hours, or billable work, to these matters. *Id.*

Defendants owe W&S $84,412.19 for these legal services, a debt that W&S communicated to Defendants through various invoices. *Id.* ¶¶ 14-15. Defendants never objected to the quality or quantity of the work done by W&S on Defendants behalf, and never complained about the amount W&S charged for its legal services on behalf of Defendants. *Id.* ¶ 14. In fact, Doley promised on several occasions that payment was forthcoming. *Id.* But payment never came. *Id.* As a result, W&S seeks relief for breach of contract.

**MOTION TO DISMISS STANDARD**

Defendants recognize, as they must, that in reviewing a motion to dismiss, the Court must "accept[] all allegations in the Complaint as true, and construe[] the pleading in the light most favorable to the plaintiff." Defs' Br. at 2; *see also Warren v. D.C.*, 353 F.3d 36, 39 (D.C. Cir. 2004). Under this standard, Defendants' Motion to Dismiss must be denied unless "it appears *beyond doubt* that the plaintiff can prove *no set of facts* in support of his claim which

3

would entitle him to relief. All factual doubts must be resolved and all inferences made in favor of the plaintiff[]." *Tele-Communications of Key West v. United States*, 757 F.2d 1330, 1334-35 (D.C. Cir. 1985) (emphases and alteration in original) (citations omitted).

## ARGUMENT

As demonstrated below, this Court should deny Defendants' Motion to Dismiss and their alternative Motion for a More Definite Statement.

**I.     The Motion To Dismiss Should Be Denied Because The Complaint States A Basic Breach of Contract Claim.**

The sole issue raised in Defendants' Motion to Dismiss is whether the complaint satisfies the elements of a breach of contract claim. It clearly does. To state a breach of contract claim for failure to pay, a "complaint will be sufficient if it alleges that the defendant is under an obligation to pay the plaintiff a certain amount of money and interest, that he or she has refused to comply with the obligation, and that payment is due, for which judgment is requested." WILLISTON ON CONTRACTS § 62:7 at 315 (2002).

Plaintiff's Complaint satisfies this low pleading threshold. First, it alleges that Defendants have an obligation to pay W&S for legal services rendered on their behalf. *See* Compl. ¶ 17 ("Defendants contracted with W&S when agreeing in writing to the terms of the engagement letter under which Defendants explicitly confirmed that they would be jointly and severably liable for the total fees and costs of W&S representing Defendants in the Lawsuit."); *id* ¶ 13 ("After the engagement letter was signed, W&S performed legal work on behalf of Defendants in the Lawsuit"). Second, the Complaint alleges that Defendants owe W&S a certain amount of money based on the contract. *See id.* ¶ 15 ("To date, Defendants owe W&S $84,412.19). Finally, the Complaint asserts that Defendants have failed to comply with their obligation, for which judgment is required. *See id.* ¶ 18 ("Defendants breached the terms of the

engagement letter when they failed to pay W&S fees and costs totaling $84,412.19"). These allegations – which, of course, must be accepted as true in this context – sufficiently allege a contractual obligation owed and breached by Defendants.

Defendants do not seriously contest that the Complaint pleads the elements of a breach of contract claim. Rather, they argue that the parties' engagement letter and corresponding invoices are too indefinite to be enforceable. This argument has no merit.

The engagement letter at issue here is precisely the type of written instrument encouraged by the American Bar Association and contemplated by the D.C. Rules of Professional Conduct to memorialize an enforceable attorney-client relationship and mutual obligations. *See* Stephen M. Terrell, *Rules of Engagement: Taking the Offense When It Comes to Defense,* ABA General Practice v.19 n.7, at 1 (Oct./Nov. 2002) ("The engagement letter is the key to the attorney-client relationship. It is the contract that, along with the Rules of Professional Conduct, governs your relationship with your client.") (Ex. 1); D.C. Rules of Prof'l Conduct 1.5(b) ("When the lawyer has not regularly represented the client, the basis or rate of the fee, the scope of the lawyer's representation, and the expenses for which the client will be responsible shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation.").

The very purpose of the letter agreement signed by the parties here was to "reduce[] the possibility of misunderstanding." *See* D.C. Rules of Prof'l Conduct 1.5(b) comment 2. By virtue of the parties' written agreement, there can be no "misunderstanding" that Defendants owe W&S for legal services rendered under the terms of the parties' agreement.

In fact, the law is clear that W&S's allegations give rise to a claim for breach of contract under the theory of account stated. An account stated arises where, as here, there is a

course of dealing between the parties, the creditor (here, W&S) has issued statements of account or invoices, and the debtor (here, Defendants) has failed to challenge the statements. *See Reed Research, Inc. v. Schumer Co.*, 243 F.2d 602, 605 (D.C. Cir. 1957).

In *Riley v. Mattingly*, 42 App. D.C. 290 (D.C. Cir. 1914), the D.C. Circuit applied the account stated doctrine in the legal fee dispute context, affirming summary judgment in favor of the lawyer. The Court of Appeals explained that "[a]n account rendered [by a legal fee invoice], and not objected to within a reasonable time, is to be regarded as admitted by the party charged to be prima facie correct, and may not be impeached save for fraud, error, or mistake." *Id.* at 294. It affirmed the grant of summary judgment in favor of the lawyer because "the account forming the basis of the action was held by the defendant for a period of eight months without being disputed in any way." *Id.* at 295. In so ruling, the D.C. Circuit rejected the defendant's defense "that plaintiffs' bill is too high" – finding that "[t]his averment raises no question of either accident or mistake." *Id.*; *see also Brand v. Westall*, Civ Act. No. 94-0312, 1995 WL 235579 (Apr. 21, 1995 D.D.C. 1995) (granting summary judgment on behalf of lawyers in a fee dispute based on an account stated theory).

These cases are on point. The complaint makes clear that the parties here entered into an engagement letter agreement governing the attorney-client relationship, W&S performed legal services under that agreement, W&S then submitted invoices to Defendants for services rendered, and Defendants accepted those invoices without objection. Compl. ¶¶ 8-15. In fact, Doley promised W&S on several occasions that payment was forthcoming. *Id.* ¶ 14. Thus, W&S has clearly made out a claim for breach of contract based on the theory of account stated. *See Riley*, 42 App. D.C. at 294-95; *Brand*, 1995 WL 235579, at *5.

II. **Defendants' Motion For A More Definite Statement Should Be Denied As Well Because Defendants Have Full Notice Of The Allegations Against Them.**

Defendants cannot seriously argue that they do not understand the basic breach of contract claim against them. Consequently, there is no basis to require W&S to serve a more definite statement, as requested.

The Federal Rules of Civil Procedure require a plaintiff to set forth only a "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. ---, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); Fed. R. Civ. P. 8(a). To be sure, "[t]he notice pleading rules . . . are not meant to impose a great burden on a plaintiff." *Hoey v. D.C.*, Civ. Action No. 07-00919 (JDB), 2008 WL 839203, at *5 (D.D.C. Mar. 31, 2008).

Although courts technically can order a plaintiff to file a more definite statement, that procedure "is plainly designed to strike at unintelligibility rather than lack of detail." MOORE'S FEDERAL PRACTICE § 12.36[1] (2008). Indeed, "[c]ourts frown on a litigant's use of the motion as a 'shotgun tactic' to substitute for discovery, or as a dilatory tactic to postpone filing an answer." *Id*; *accord Sultanate of Oman v. H & S Computer Servs., Inc.*, Civ. Action No. 87-2688-OG, 1988 WL 47638, at *2 (D.D.C. Apr. 29, 1988) ("[A] motion for a more definite statement is reviewed with skepticism and will be granted only to cure an unintelligible claim").

As discussed above, Plaintiff's Complaint alleges a simple claim for breach of contract that is spelled out in detail. Defendants appear to understand these charges. *See* Defs' Mot. at 1 ("The plaintiff suggests that a document signed on April 19, 2007 was a contract which

7

the defendants breached"). They do not argue that any of the allegations are unintelligible. Accordingly, there is no need for a more definite statement.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that this Court deny Defendants' Motion to Dismiss the Complaint, or in the Alternative, for a More Definite Statement.

Respectfully submitted,

_____\\s\_____
Thomas M. Buchanan # 337907
Charles B. Klein, # 450984
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
(202) 282-5000

Dated: April 22, 2008              *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing *Plaintiff's Opposition to Defendants' Motion to Dismiss, or in the Alternative, for a More Definite Statement* was sent through the Court's electronic transmission facilities on this 22d day of April, 2008.

_____\s\_____
Charles B. Klein, # 450984
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C.  20006-3817
(202) 282-5000

# EXHIBIT 1



**Print This Page** | Close Window



ABA General Practice, Solo & Small Firm Division

**Volume 19, Number 7**
**October/November 2002**

**Rules of Engagement**
**Taking the Offense When It Comes to Defense**

*By Stephen M. Terrell*

It's a scene played out every day in countless law offices across the country: A valued business client walks in to your office and recites how he has gotten into a dispute over his latest project. You ask, "Did you bring the contract with you?" A deadly, prolonged pause ensues. Sheepishly, the client lowers his head. In that instant, you know: He has no written contract. All those conferences about how important it is to put the terms of an agreement
in writing have been ignored.
"Joe, you know how many times I've told you-get your contracts in writing. It's a lot cheaper to have a lawyer review a contract than it is to litigate a dispute."
"Will you still take the case?" Joe asks.
"Sure, Joe, I'll start work on it right away."
But wait-did you say "right away"? Where's the written contract? What happened to all those warnings about "handshake deals" and admonitions to "get it in writing" so there are no mistakes about the terms? What about that risk-management advice concerning the benefits of written contracts?
Physician, heal thyself!

Unfortunately, this scenario happens every day in solo and small firm law offices all across the country. Lawyers undertake representation with little more than an understanding and a handshake. As a group, we often fail to take our own oft-repeated advice to clients about formalizing our business relationships in writing. We should know better-and do better.
Engagement letters, nonengagement letters, letters of limited representation, and disengagement letters should be a fundamental and routine part of every lawyer's practice. They are a simple, effective, and inexpensive way to prevent misunderstandings with clients, minimize risks, and even enhance firm marketing. Like having an annual physical, we all know we should be doing it; we just don't. But the limited time it takes to draft and utilize effective engagement, nonengagement, and disengagement letters may be the best work you do to manage your practice.

**Engagement Letters**
The engagement letter is the key to the attorney-client relationship. It is the contract that, along with the Rules of Professional Conduct, governs your relationship with your client. A well-drafted engagement letter sets out the specific responsibilities the lawyer undertakes, as well as the client's obligations. It is invaluable in avoiding disputes with clients and, if conflict arises, becomes the key document by which the dispute will be resolved.

Ann Massie Nelson, director of communications for Wisconsin Lawyers Mutual Insurance Company, has reduced the function of the engagement letter to a mnemonic, ACCEPT.1 She recommends that the letter:
o **Acknowledge who is the client.** This means expressly identifying who the lawyer represents and, if appropriate, who the lawyer does not represent. (The latter often is more important when the issue does arise.)
o **Set the circumstances of the employment**, the specific matter for which the lawyer is being retained.
o **Establish the expectations**, what the lawyer is really agreeing to do.
o **Detail the payment for services and the timing for payment.** As all lawyers know, issues over billing and payment are frequently the flash point for lawyer-client disputes. Include the hourly fee for each attorney and paralegal, how any contingency fee will be calculated, and what expenses will be charged. The more details provided in the engagement letter, the less wiggle room for disputes to arise.

Retainers may deserve special attention2 because they're often confusing to clients. Are they applied to the first bill or the last? Are they used to pay ongoing fees, and do they need to be replenished each month to maintain a constant amount? These matters need to be spelled out.

Another essential is termination.3 Although the client may understand that she can fire the lawyer, circumstances under which the lawyer can fire the client need to be made clear. Of course, this provision should comply with applicable rules of professional conduct.

**Letters of Limited Representation**
Traditionally, clients have viewed solo and small firm lawyers personally, as "my lawyer." This is one of the reasons why surveys consistently show that respondents hold the legal system in low regard but think highly of their own lawyers.

But the personal tradition is fading. According to Barrie Althoff, chief disciplinary counsel for the Washington State Bar Association, more clients are not looking for the full bundle of legal services and representation. In a series of articles in the bar's newsletter, Althoff observes they are opting instead-at least at the outset-for limited representation. To a large extent, this trend is caused by the simple fact that many clients cannot afford full-service representation.4

Although this "unbundling" of legal services is permissible, it is full of pitfalls for the unwary lawyer. But Althoff emphasizes the "default" scope of representation, and unless the lawyer has specified a limitation on the representation, she will be held to the "full services" approach.

In order for a lawyer to limit representation to a specific matter or issue, the lawyer must comply with the applicable rules of professional conduct. Model Rule 1.2 permits the lawyer to limit representation provided that the lawyer consults with the client about the limited representation and that, after the consultation, the client consents to the limitation. Although putting the agreement in writing is not required by the rules, common sense and good practice suggest specifically setting forth the limits of representation in an engagement letter. The letter should identify the specific matter and services for which the lawyer is being retained and further specify that the lawyer is not being retained for any other purpose. Good practice would also require including a provision that any additional legal services would require a separate engagement letter.

Having set out the terms and limitations of the engagement, the lawyer must not stray from these terms. A lawyer who agrees only to provide certain services then goes on to provide broader representation may find herself "on the hook" for providing full legal services despite her engagement letter to the contrary. If your representation of the client begins to expand into new areas or matters, a new engagement letter for each area or matter is required.

**Nonengagement Letters**
Nonengagement letters are perhaps the most overlooked of all the letters establishing terms of employment-or, in this case, the terms of nonemployment. Whether through informal discussions at a cocktail party or formal consultation meetings in the office, lawyers are frequently asked to "just take a look at" a matter. If, after review, the lawyer decides not to take the case, what should be done? For many, the answer is nothing-just make a phone call saying thanks but no thanks. After all, you didn't take the case, so why do more?

The answer, of course, is self-protection and risk management. According to Harvey L. Wendell, an attorney in Madison, Wisconsin, the absence of nonengagement letters often means firms have to compromise their fees or lose legal malpractice cases. Wendell strongly recommends that a nonengagement letter should be used any time a prospective client makes a request for legal service and the firm decides not to accept the employment. A mere oral response invites financial exposure to the firm.5

The same thoughts are echoed by Chris Stiegemeyer, vice president for The Bar Plan insurance company. Stiegemeyer, who speaks nationally on risk management for lawyers, strongly encourages the use of nonengagement letters. At a minimum, he says, the letter should set out the nature and purpose of the meeting between the prospective client and lawyer and assert that no representation was accepted by the firm, the matter may be subject to a statute of limitations that could bar the person's claim, and prospective counsel should seek another attorney or take other appropriate measures on its own behalf to protect their interests.

Stiegemeyer recommends against giving an opinion in a nonengagement letter as to when the statute of limitations will run. If the prediction is wrong, the firm could be exposed to a malpractice claim even though it never accepted employment. The one exception to this rule is when the statute of limitations will run in the immediate future. In these cases, Stiegemeyer recommends advising the potential client of the date for the running of the statute and documenting how that date was calculated (i.e., "Based on our brief meeting and not on any additional research or investigation by our firm, it appears your statute of limitations may run as soon as...").

But even a nonengagement letter can be used as a business development tool. A friendly note at the end of the letter can advise the prospective client that your not taking the case does not mean you would not be interested in representing the client in other matters in the future.

**Disengagement Letters**

The attorney-client relationship can terminate for many reasons: The matter for which representation was needed is complete; the firm has discovered a conflict of interest; the client has not paid the bill or cooperated. Regardless of the reason, terminating the attorney-client relationship must be done with care. It also must be done in compliance with Rule 1:16, declining or terminating representation, as well as any applicable local court rules. These rules generally deal with protecting the client's interests.

The importance of a well-crafted termination letter is emphasized by Hammond, Indiana, lawyer Melanie Dunajeski. She advises firm associates to imagine, before sending out a termination letter, the letter before them in a deposition with an exhibit sticker on it. This visual imagery brings home the care with which such a letter must be drafted.

Ann Massie Nelson summarizes the necessary content of a termination letter with the mnemonic PART,6 suggesting that every termination letter include the following sections:

o **Position:** Clearly state the position of the firm in terminating the employment.
o **Action:** Recite both the action taken to date by the lawyer and the actions the client needs to take. Recommenda-tions from malpractice carriers are to be careful with statements about exact dates or deadlines because a misstatement can expose the lawyer to a malpractice claim. Of course the letter should encourage the now ex-client to seek other legal counsel as soon as possible.
o **Reason:** Clearly state the reason for the termination ("You have failed to pay legal fees as set forth in our engagement letter").
o **Terms:** Address all outstanding legal fees and expenses and include a final bill.

**Where to Turn**

Those seeking guidance on the subject of engagement letters, nonengagement letters, and disengagement letters will find ample resources. Jay Foonberg's classic How to Start & Build a Law Practice (ABA 1999) contains examples of engagement, nonengagement, and disengagement letters. Another widely recognized book that discusses these issues is The Law of Lawyering, by Geoffrey C. Hazard and W. William Hodes. The Essential Formbook: Comprehensive Management Tools for Lawyers, by Gary A. Munneke and Anthony E. Davis, provides samples of almost every form you might require.

The ABA's Law Practice Management Section (www.abanet.org/lpm) is a valuable resource for all types of information regarding your practice, including information on engagement letters. Various state bar associations also serve as resources for sample letters, for example, online links to bar materials from Georgia, Wisconsin, Washington, North Carolina, and Missouri. Check out their websites and archives of journal articles.

The Internet also is a rich source of materials. A Google or Yahoo search under "lawyer engagement letter" or a similar term will return a wide range of searchable sites and useful information.

**Notes**
1. Ann Massie Nelson, Six Elements of An Engagement Letter, WIS. LAW., Dec. 1994, (available from Archives, www.wilmic.com).
2. Richard D. Harroch, Five Key Provisions in Attorney/Client Engagement Letters, LawCommerce.com (www.lawcommerce.com/info/five_key_prov.asp).
3. Id.
4. Barrie Althoff, Limiting the Scope of Your Representation: Questions of Cost, Candor and Disclosure, 1997 WASH. ST. B. NEWS (www.wsba.org/barnews/archives97/limiting2.html).
5. Harvey L. Wendell, Old Timer Comments, WIS. L PRAC. NEWSL. (Winter 1999) (www.wisbar.org/sections/lp/news/win99.html).
6. Ann Massie Nelson, Letters Protect You When You PART Ways or PASS on Representation, WIS. LAW. (1995) (available from Archives, www.wilmic.com).

**Stephen M. Terrell** is a member with Landman & Beatty in Indianapolis, Indiana.

| Past Issues | » |
|---|---|

Search GPSOLO [Go]
*Search archives since 1995*

Browse Past Issues of *GPSOLO*



**Enjoy the benefits of membership:**

*Award-Winning Periodicals*
*Special Member Discounts*
*Practice Area Committees*
*Continuing Legal Education*
*Networking Opportunities*
*Leadership Opportunities*

**Not a Member?**
**Join Now!**

## 2007/08 Editorial Board

### *GPSOLO* Magazine

**Editor-in-Chief**
Joan M. Burda   jmburda@mac.com

**Assistant Editor**
Judy Toyer

**Editorial Board**
Jeffrey M. Allen
Martha J. Church
Jane Kow
David Leffler
Karen Renzulli Lynch
John P. Macy
James P. Menton
Larry Ramirez
Laurie K. Redman
James Schwartz
Andrew C. Simpson
Bryan S. Spencer

### *Technology & Practice Guide* Issue

**Special Issue Editor**
Jeffrey M. Allen   jallenlawtek@aol.com

**Editorial Board**
Wells H. Anderson
Daniel S. Coolidge
Bruce Dorner
D.A. Drouillard
Kimberly T. Lee
Alan Pearlman
Nerino J. Petro, Jr.
J. Anthony Vittal
*Ex Officio*: Ross Kodner

### *Best of ABA Sections* Issue

**Special Issue Editor**
Jennifer J. Ator   jenniferjator@gmail.com

**Editorial Board**
Lloyd D. Cohen
David Zachary Kaufman

**ABA Publishing**
Director of Publishing: Bryan Kay
Editorial Director: Claire L. Parins
Editor: Robert M. Salkin
Editorial Assistant: Oreather McLin
Design and Production Director: Russell Glidden
Senior Art Director: Tamara Nowak
Print Administration Director: John Rhead
Production Coordinator: Sandy Rogers

**This page was printed from:** http://www.abanet.org/genpractice/magazine/2002/oct-nov/rules.html

Close Window

© 2008. American Bar Association. All Rights Reserved. ABA Privacy Statement